IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

-------------------------------------------------- :
JACK O. CARTNER, et al.                            :   CASE NO.  1:07 CV 1589
                                                   :
                                       Plaintiffs, :
                                                   :
              -vs-                                 :   MEMORANDUM OF OPINION AND
                                                   :   ORDER CONSTRUING UNITED
                                                   :   STATES PATENT NO. 5,197,284
ALAMO GROUP, INC.,                                 :
                                                   :
                                       Defendant.  :
-------------------------------------------------- :
                                                   :
                                                   :
                                                   :
                                                   :

UNITED STATES DISTRICT JUDGE LESLEY WELLS

        On 30 May 2007, Plaintiffs Jack Cartner and Motrim, Inc. (collectively "Mr.

Cartner") filed their complaint against Defendant Alamo Group, Inc. ("Alamo").  (Doc. 1).

The Complaint alleges that Mr. Cartner is the owner of all right, title, and interest in two

patents: United States Patent Nos. 5,197,284 ("the '284 patent"), and 7,185,479 (the

'479 patent).  Pursuant to the parties' agreement, the Court subsequently dismissed the

'479 patent from this suit.[1]

---

        [1]Mr. Cartner's complaint alleged infringement on the '479 patent issued to Mr.
Cartner on 6 March 2007 and entitled "Mower Head and Movable Guard."  As
represented in his complaint, " Mr. Cartner invented a novel mower head with a
movable guard that provides enhanced safety features to protect operators and
bystanders from the risk of injury and to protect equipment from damage when the
mower head confronts obstacles such as fence posts and trees."  (¶15).
        On 4 April 2008, pursuant to the parties' Rule 41 stipulated agreement, the Court
Ordered the dismissal of the Plaintiffs' '479 patent claims and Defendant's attendant
counterclaims.  Patent claims 1-12, 19, and 23-26 of the '479 patent were dismissed

According to the Complaint, the '284 patent, coined the "Hydraulic Motor Deceleration System," was issued on 20 March 1993 to Mr. Cartner and exclusively licensed to Motrim for manufacture and sale.  Mr. Cartner claims that Alamo is willfully and wantonly infringing the '284 patent without authority or license by manufacturing, offering for sale, and selling various infringing boom arm and rotary mowers in violation of 35 U.S.C. § 271.  In its Counterclaim, Alamo seeks a declaratory judgment of non-infringement and invalidity of the '284 patent, arguing that when properly construed, the '284 patent claims do not cover any of Alamo's products.  (Doc. 7).

The parties submitted a joint claim construction chart on 14 March 2008 (Doc. 15), followed by opening claim construction briefs (Docs. 17, 18, 19) on 28 March 2008, and responsive pleadings (Docs. 22, 23) on 30 April 2008.  The Court held a Markman hearing on the disputed claim constructions on 13 May 2008.  At the hearing, counsel for Mr. Cartner and Alamo presented oral argument but no testimony from witnesses.

## I.  BACKGROUND AND CLAIMS

The '284 patent presents a system for decelerating a hydraulic motor.  The '284 patent specifically relates the following background:

> The present invention pertains to hydraulically powered equipment. More particularly, this invention relates to the use of a deceleration circuit for a hydraulic motor.
> The invention finds particular application in hydraulic motors which are used to power mowers and ditchers or the like utilized in road

---

with prejudice while the remaining claims, and defendant's attendant counterclaim, were dismissed without prejudice.  (Doc. 21).

2

maintenance equipment.  However, it should be appreciated that the hydraulic motor deceleration system also finds application in other equipment in which a hydraulic motor is employed.

As is well known, hydraulically driven motors are currently utilized to power mowers, ditchers and like equipment especially equipment of the type that is secured to articulated boom assemblies pivotally connected to a tractor and used to maintain the berms of roads and the like.  Currently, in such equipment, when hydraulic power is shut off to the motor, the motor, and with it the grass cutting blade or ditching blade which it drives, continues to freewheel (since the control valve of the motor generally has a motoring spool) when communication is interrupted between the hydraulic pump and the motor.  If, on the other hand, a non-motoring spool were to be provided, the motor would come to a precipitous stop once the control valve would be actuated to the off position so that communication would be blocked between the hydraulic pump and the motor.  Neither one of these alternatives is particularly desirable.  When the motor is allowed to freewheel, it does not come to a stop very quickly and the cutting blade may damage something while the boom arm to which the blade housing is secured is being moved.  On the other hand, if the motor and the blade would come to a precipitous stop, great strains would be placed on the motor as well as the fasteners connecting the cutting blade to the motor and the blade would likely break its fasteners and fly off the motor.

('284 patent, col. 1, lines 13-49).

According to the '284 patent, the hydraulic system includes three principle components: a pump, a hydraulic motor, and a motor hydraulic circuit connecting the pump and the motor.  ('284 patent, Abstract).  The motor hydraulic circuit includes a first fluid line running between the pump and an inlet of the motor and a first control valve located in the fluid line.  That valve selectively allows the flow of fluid between the pump and the motor inlet.  The motor hydraulic circuit also includes a second fluid line running from an outlet of the motor to the first control valve.  In addition, the motor hydraulic circuit has a third fluid circuit allowing a flow of fluid between the first and second fluid lines; a flow control orifice sits in this third circuit and is used for slowing the flow of fluid between the first and second fluid lines.  Id.

3

The '284 patent relates the specifications of six separate embodiments of a hydraulic motor deceleration circuit (Figures 1, 1A, 1B, 2, 3, 4) and concludes with twelve claims.  Mr. Cartner asserts claims 1, 4, 5, and 12 of the '284 patent against Alamo based on Alamo's production and sale of several industrial mowers.  Pursuant to the '284 patent, claim 1 is directed to "[a] hydraulic control system"; claim 5 is directed to "[a] hydraulic motor deceleration system"; and claims 4 and 12 are both directed to "[a] method for decelerating a hydraulic motor when the motor is disconnected from a hydraulic pump."

In specifying the embodied figures, the '284 patent relates the drawings are for "illustrating preferred and alternate embodiments of the invention only and not for purposes of limiting same."  ('284 patent, col 3, lines 35-37).  The specification names Figure 1 as the "first preferred embodiment," Figure 3 as the "second preferred embodiment," Figure 2 as the "first alternate embodiment," Figure 1A as the "second alternate embodiment," and Figure 1B as the "third alternate embodiment."  ('284 patent, cols. 3, 4, 5, 6).

In his First Amendment on 18 January 1991, Mr. Cartner directed that "claim [1] relates to the embodiment disclosed in Figure 1A of the instant application."  (First Amendment, p. 6).  Claims 1 and 4 of the '284 patent are both directed to the Figure 1A embodiment of the '284 patent.  The means-plus-function clause of claim 1 describes a hydraulic control system comprised of "a means for allowing a circulation of fluid through said motor and between said first and second fluid lines when said pump is disconnected from said motor, wherein said means for allowing circulation comprises a fluid path in said second envelope of said first control valve which fluid path allows a

4

flow of fluid therethrough without fluid loss, and a means for slowing a flow of fluid between said first and second fluid lines wherein said means for slowing comprises a flow control orifice located in said fluid path in said second envelope of said first control valve."  ('284 patent, col 8, lines 5-16).

While the parties agree that the corresponding structure in the '284 patent includes the circuitry depicted in Figure 1A (a fluid path in the second envelope (74) of the first control valve (70) that connects the first fluid line (14") to the second fluid line (24")), Mr. Crayton maintains that claim 1 includes a second structure, Figure 1, which includes a "third fluid line (40), which connects first fluid line (14) to second fluid line (24).  Alamo insists that while Figure 1 is the preferred embodiment, as enunciated in the specification, including that embodiment in Claim 1 render's Mr. Crayton's proposed construction incompatible with claim 1's requirement that the "means for allowing circulation comprises a fluid



path in said second envelope of said first control valve."  Alamo points to the second envelope (74) in Figure 1A, and finds that flow control orifice (76) does allow circulation of a fluid path in the second envelope of the first control valve, while the second

5

envelope (34) of Figure 1 does not allow the circulation of fluid between the first (14) and second (24) hydraulic lines.

Claim 4 of the '284 patent also anticipates the description embodied in Figure 1A. Claim 4 directs a method for decelerating a hydraulic motor when the motor is disconnected from a hydraulic pump.  That method relies upon "slowing the speed of rotation of said motor by restricting the rate of flow of fluid through said first and second fluid lines wherein said step of slowing the speed comprises the subsidiary step of providing a flow control orifice (76) in one envelope (74) of said first valve (70), said one envelope (74) communicating said first and second hydraulic fluid lines, while preventing a flow of fluid out of said first and second fluid lines and also preventing a flow of fluid from said pump to said motor."  ('284 patent, col. 8, lines 38-47).  Only Figure 1A depicts a flow control orifice in one envelope of the first valve, as Figure 1 depicts the flow control orifice (44) in the third fluid line (40), a line whose description is absent from claims 1 and 4.

6

Claim 5 of the '284 patent anticipates the description embodied in Figure 1.  Claim 5 directs a hydraulic motor deceleration system comprised of "a third hydraulic fluid line (40) interconnecting said first (14) and second (24) hydraulic lines, a relief valve (42) located in said third fluid line, a flow control orifice (44) located in said third fluid line, said flow control orifice being constantly operative."  ('284 patent, col. 8, lines 61-66).



Claim 12 of the '284 patent also anticipates the description embodied in Figure 1.  Claim 12 directs a method for decelerating a hydraulic motor when  the motor is disconnected from a hydraulic pump.  That method comprises "a third hydraulic fluid line (40) which selectively communicates said first and second fluid lines (14 and 24) as regulated by a relief valve (42); and providing a flow control orifice (44) in said third fluid line (40), said flow control orifice (44) being constantly operative to throttle fluid flow through said third fluid line (40)."  ('284 patent, col. 8, lines 20-26).

7

## II.  LAW REGARDING CLAIM CONSTRUCTION

Courts have the "power and obligation to construe as a matter of law the meaning of language used in patent claims."  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).  In construing a patent claim, a court must look first to the language of the claim itself, Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996), because its words are "of paramount importance," Electro Medical Sys. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994).  In Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) the United States Court of Appeals for the Federal Circuit observed "the claims themselves provide substantial guidance as to the meaning of particular claim terms."  Citing Vitronics, 90 F. 3d at 1582; see also ACTV, Inc. v. Walt Disney Co., 346 F. 3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms").

However, the claim cannot be considered in isolation.  See Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).  "It is equally fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."  Bell Communications, 55 F. 3d at 620 (internal quotes and citations omitted);  see also Markman, 52 F.3d at 979.

> The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.  As we have repeatedly stated, "[c]laims must be read in view of the specification, of which they are a part."  The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it.  Thus, the specification is

8

always highly relevant to the claim construction analysis.  Usually, it is
dispositive; it is the single best guide to the meaning of a disputed term.

Vitronics, 90 F. 3d at 1582 (internal citations omitted).  In Phillips v. AWH Corp., 415

F.3d at 1315, the Court enunciated the importance of specifications in providing the

context from which meaning might emerge:

> This court and its predecessors have long emphasized the importance of
> the specification in claim construction. . . . [Indeed,] "[t]he descriptive part
> of the specification aids in ascertaining the scope and meaning of the
> claims inasmuch as the words of the claims must be based on the
> description.  The specification is, thus, the primary basis for construing the
> claims."  Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed.
> Cir.1985). . . . The importance of the specification in claim construction
> derives from its statutory role.  The close kinship between the written
> description and the claims is enforced by the statutory requirement that
> the specification describe the claimed invention in "full, clear, concise, and
> exact terms."  35 U.S.C. § 112, para. 1. . . . In light of the statutory
> directive that the inventor provide a "full" and "exact" description of the
> claimed invention, the specification necessarily informs the proper
> construction of the claims. . . . Consistent with that general principle, our
> cases recognize that the specification may reveal a special definition given
> to a claim term by the patentee that differs from the meaning it would
> otherwise possess.  In such cases, the inventor's lexicography governs.
> In other cases, the specification may reveal an intentional disclaimer, or
> disavowal, of claim scope by the inventor.  In that instance as well, the
> inventor has dictated the correct claim scope, and the inventor's intention,
> as expressed in the specification, is regarded as dispositive. . . . The
> pertinence of the specification to claim construction is reinforced by the
> manner in which a patent is issued.  The Patent and Trademark Office
> ("PTO") determines the scope of claims in patent applications not solely
> on the basis of the claim language, but upon giving claims their broadest
> reasonable construction "in light of the specification as it would be
> interpreted by one of ordinary skill in the art."  In re Am. Acad. of Sci.
> Tech. Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004).  Indeed, the rules of the
> PTO require that application claims must "conform to the invention as set
> forth in the remainder of the specification and the terms and phrases used
> in the claims must find clear support or antecedent basis in the description
> so that the meaning of the terms in the claims may be ascertainable by
> reference to the description."  37 C.F.R. § 1.75(d)(1). It is therefore entirely
> appropriate for a court, when conducting claim construction, to rely heavily
> on the written description for guidance as to the meaning of the claims.

9

Phillips, pp. 1314-17.

The court also may consider the prosecution history, including any express representations the patentee might have made regarding the scope of the claims and any changes to the claim the patentee might have made to distinguish her or his claim from the prior art.  Id.  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).  The Court in Phillips observed the particular relevance of a patent's prosecution history:

> The prosecution history, which we have designated as part of the "intrinsic evidence," consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent.  Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.  Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

Phillips, p. 1317.  Together, these three forms of "intrinsic" evidence comprise "the most significant source of the legally operative meaning of disputed claim language."  Id.

When intrinsic evidence does not resolve an ambiguity, a court may consider extrinsic evidence – i.e., all evidence external to the patent and to its prosecution history, including expert testimony, dictionaries, and treatises.  See Vitronics, 90 F. 3d at 1583.  For instance, a "trial court, when construing a term of art, must define the term in a manner consistent with the scientific and technical context in which it is used in the patent."  AFG Industries, Inc. v. Cardinal IG Company, Inc. 239 F. 3d 1239, 1248

10

(Fed. Cir. 2001).   In doing so, "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."  Id. at 1249 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999)).

Throughout the process of claim construction, the court must take care not to focus on "the subjective intent of the parties to the patent contract when they used a particular term.  Rather, the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."  Markman, 52 F.3d at 986.  Thus, there is a "heavy presumption" that claim terms have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).

"Dictionaries are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims."  Id.  However, "[b]ecause words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor."  Id. at 1203.  "[T]he presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning." Id. at 1204.

11

Ultimately, for the reasons observed by the Court in <u>Phillips</u>, courts reviewing patent disputes accept extrinsic evidence with important caveats:

> We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms, for several reasons.  First, extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning.  Second, while claims are construed as they would be understood by a hypothetical person of skill in the art, extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent.  Third, extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence.  The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination.

<u>Phillips</u> at 1318.

There are additional relevant canons of claim construction.  A term recited in multiple claims of one patent must be ascribed the same meaning in each claim. <u>Southwall Technologies</u>, 54 F.3d at 1579.  Similarly, a term used in multiple, related patents should be construed in the same way unless there is evidence that a different meaning was intended for a particular patent.  <u>Jonsson v. Stanley Works</u>, 903 F.2d 812, 818 (Fed. Cir. 1990).  Also, a claim should not be construed in a manner that renders the claim language meaningless or superfluous.  <u>Texas Instruments, Inc. v. United States ITC</u>, 988 F.2d 1165, 1171 (Fed. Cir. 1993); <u>see also</u> <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc</u>., 381 F. 3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim").

In addition to the judicially-created rules of claim construction, the patent statute provides a rule of claim construction for "means-plus-function" claiming.  Under 35

12

U.S.C. § 112, ¶ 6, an element of a claim, such as the mechanical components in this

instance, may be claimed as a "means" for performing a specified function, without

reference to a specific supporting structure or embodiment.  35 U.S.C. § 112, ¶ 6 recites

the following:

> An element in a claim for a combination may be expressed as a means or
> step for performing a specified function without the recital of structure,
> material, or acts in support thereof, and such claim shall be construed to
> cover the corresponding structure, material, or acts described in the
> specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.  "Claim construction of a §112, ¶ 6 limitation includes identifying

the claimed function and determining the corresponding structure or act disclosed in the

specification, both of which are questions of law."  IMS tech., Inc., v. Haas Automation,

Inc., 206 F.3d 1422, 1430 (Fed. Cir. 2000).  Applying § 112, ¶ 6 to a claimed function:

> requires both identification of the claimed function and identification of the
> structure in the written description necessary to perform that function. The
> statute does not permit limitation of a means-plus-function claim by
> adopting a function different from that explicitly recited in the claim. Nor
> does the statute permit incorporation of structure from the written
> description beyond that necessary to perform the claimed function.

Micro Chem. Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1257-58 (Fed. Cir.

1999).  See Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412

F.3d 1291, 1298-99 (Fed. Cir. 2005) (A structure disclosed in the specification qualifies

as "corresponding" structure only if the specification or prosecution history clearly links

or associates that structure to the function recited in the claim).  This duty to link or

associate structure to function is the quid pro quo for the convenience of employing §

112, ¶ 6. See O.I. Corp. v. Tekmar Co., 115 F. 3d 1576, 1583 (Fed. Cir. 1997).

13

### III.  CLAIM CONSTRUCTION

**A.** **Agreed Terms**

**1.  "Located in said . . . fluid line" & "in said . . . fluid line."**

These terms are located in claims 1, 5, and 12 of the '284 patent.  The parties have agreed that the terms in question should be constructed as "[l]ocated such that the associated fluid line enters and exits the [first control valve/relief valve/flow control orifice] that is 'in' the associated fluid line."  The parties predicate their agreement on figures 1-4, and language in the '284 patent as expressed in claims 1, 5 and 12.

**2. "as regulated by said relief valve" & "as regulated by a relief valve."**

These terms are located in claims 5 and 12 of the '284 patent.  The parties have agreed that these terms should be constructed as "[r]elief valve controls whether and how much fluid may flow."  The parties predicate their agreement on figures 1, 1B, 2, and 4, and the language of the '284 patent specification.  ('284 patent, col. 4, lines 41-45; col. 6, lines 44-47).

**3.  "firt"**

14

This term is found in claim number 4 of the '284 patent.  The parties agree that

no construction is necessary for this typographical error, which the parties read as the

term "first."


B.    **Disputed Terms**

1.  **"**a flow control orifice **located in said fluid path"**

This term is found in claim number 1 of the '284 patent.  In his papers before the

court, Mr. Cartner proposes that no construction is necessary to render the meaning of

the term.  Instead, the Plaintiffs suggest that a "fluid path" should be understood as a

path through which fluid can flow, and is further limited by the means-plus-function

clause of claim 1.

In its brief before the Court, Alamo proposes the term should be constructed as

follows:

> A flow control orifice is located in the fluid path that connects the first and
> second hydraulic fluid lines.  The term "fluid path" is further limited by the
> means-plus-function clause (circulation allowing means) of claim 1 and the
> "wherein" clause immediately following that means-plus-function clause.

Alamo predicated its construction on figure 1A, the language of claim 1, and the '284

patent specification.

Pursuant to the following colloquy, which occurred during the parties' Markman

hearing before the Court, the Court considers the parties in agreement on this term:

> MR. MOY:  Your Honor, the second disputed claim term is claim term
> number two, "located in said fluid path", which is in Claim 1 of the '284
> patent.  Plaintiffs insist that this claim term requires no  construction by the
> Court.  The meaning of "located in" is controlled by how the Court will
> construe claim term number two.  Excuse me.  How the Court will
> construe,  located in, or located in said path.  And the meaning of said

fluid path is determined by language earlier in the claim.  Claim 1 refers to a fluid path in said second envelope of said first control valve.  So in said fluid path is in the fluid path of said second envelope of said first control valve.  There is no special construction required of this term.  Thank you.

MR. AUVIL:  Your Honor, I'm not sure in light of what Mr. Moy said whether we have a disagreement any more.  Our main point is that "located in said fluid path" is, refers back to the fluid path that is described earlier in the claim, and the second point says said fluid path is defined earlier in the claim in the limitation of a fluid path in said second envelope of said first control valve which fluid path allows a flow of fluid therethrough without fluid loss.  Our point is it has to incorporate that.  And if I heard Mr. Moy correctly, he agrees.

THE COURT:  Let me just ask him to put that on the record, whether he agrees or not.

MR. MOY:  Yes, Your Honor.

THE COURT:  Okay.  All right.  That's fine.

(Tr. pp. 21-23).

Accordingly, the construction of the term "located in said fluid path" requires incorporation of the means-plus-function limitation and the "wherein" clause of Claim 1 preceding the term "located in said fluid path."  The Court, therefore, adopts Alamo's proposed construction of the terms as "[a] flow control orifice is located in the fluid path that connects the first and second hydraulic fluid lines.  The term "fluid path" is further limited by the means-plus-function clause (circulation allowing means) of claim 1 and the "wherein" clause immediately following that means-plus-function clause."

**2.** "**disconnected**"

16

This term appears in claim numbers 1, 4 and 12 of the '284 patent in the following manner: "when said pump is disconnected from said motor" (claim 1); "when the motor is disconnected from a hydraulic pump" (claims 4 & 12).

Mr. Cartner proposes to construct the term to read "[t]he pump is not delivering pressurized hydraulic fluid to the motor."  The Plaintiffs rely primarily upon the prosecution history of the '284 patent for the phrasing of their proposed construction. Specifically, Mr. Cartner notes that in a Response, dated 13 February 1992, directed to rejections based on a prior art reference identified as Burroughs (U.S. Patent No. 3,429,123), Mr. Cartner's attorney characterized the Burroughs reference as "teach[ing] a way to limit the deceleration of a motor only as long as a pump is delivering pressurized hydraulic fluid to the motor."  (Moy Dec., Ex. E. Response, 13 Feb. 1992, p. 4).  Mr. Cartner maintains that the Response sought to distinguish Burroughs from what would be claimed as the '284 patent by addressing the deceleration of the motor occurring when the pump is "disconnected" from the motor.  The Response recites:

> It is respectfully submitted, therefore, that Burroughs teaches away from the claimed invention which relates to a means for decelerating the motor at a controlled rate **when a pump is not delivering pressurized hydraulic fluid to the motor**.

Id. (emphasis in Plaintiffs' brief).

Alternatively, Alamo proposes the term should be constructed to read "[t]he pump and motor are not connected, such that fluid cannot flow from the pump to the motor." In support of its construction Alamo points to the corresponding Figures embodied in each of the claims 1, 4, and 12 that contain the term "disconnected" to argue that the flow of hydraulic fluid is prevented from flowing between the pump and the motor when

17

the pump is "disconnected" from the motor.  As such, when the pump is "disconnected" from the motor in Figure 1A, which Alamo claims corresponds to claims 1 and 4, the second envelope (74) of the first control valve (70) illustrates that hydraulic fluid from the pump only flows into the reservoir, while hydraulic fluid from the motor circulates through a flow control orifice (76) before returning to the motor.  Figure 1A does not embody a connection of the hydraulic fluid between the pump and the motor when the pump is disconnected from the motor.  Similarly, for Figures 1, 1B, 2, 3, and 4, which apply to claim 12 of the '284 patent, when the motor is "disconnected" from the hydraulic pump those Figures illustrate that hydraulic fluid from the pump is prevented from connecting with hydraulic fluid from the motor through the second envelope of the first control valve.

Alamo further maintains that Mr. Cartner's sole reliance on the prosecution history to bolster his proposed construction runs counter to claim construction principles which regard such reliance as improper when the effect is to expand the scope of a claim limitation.  See Superguide Corp. V. DirecTV Enters., 358 F.3d 870, 887-88 (Fed. Cir. 2004) (relying on Northern Telecom Ltd. v. Samsung Electronics Co., Ltd., 215 F.3d 1281, 1295 (Fed. Cir. 2000) in refusing to enlarge the scope of a claim from its "plain and ordinary meaning based on prosecution history").

A review of claims 1, 4, and 12 indicate instances in which the '284 patent describes the motor as "disconnected" from the pump by reference to other linguistic terms.  In claim 4, the method discusses "*blocking* a flow of fluid from said motor to said pump" ('284 patent, col. 8, line 34, emphasis added), and "*preventing* a flow of fluid from said pump to said motor."  ('284 patent, col. 8,lines 46-47, emphasis added).  In claim

18

12, the method discusses "*blocking* a flow of fluid from said motor to said pump" ('284 patent, col 10, line 12, emphasis added).

Based upon the above analysis, the Court construes the term "disconnected" to mean: "the pump and motor are not connected, such that fluid cannot flow from the pump to the motor." Mr. Cartner's argument that the prosecution history indicates the term to mean "the pump is not delivering pressurized hydraulic fluid to the motor" is unpersuasive as a matter of claim construction and law. The Court's adopted construction, as urged by Alamo, maintains fidelity to the claim language and better describes both the mechanical condition of disconnection and the effect of that condition.

### 3. "**a means for allowing a circulation of fluid through said motor and between said first and second fluid lines when said pump is disconnected from said motor**."

This term is found in claim number 1 of the '284 patent. The parties agree (Tr. 17) that the circulation-allowing means of claim 1 should be construed under 35 U.S.C. § 112, ¶ 6 which recites:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The parties disagree on how many structures disclosed in the specification should be included in the Court's construction of this phrase.

Mr. Cartner maintains that the specification of the '284 patent discloses two distinct structures that perform the recited circulation-allowing function in claim 1.

Those structures are shown in Figure 1A and Figure 1. Both parties agree that Figure 1A applies to claim 1. Mr. Cartner submits that the disclosure of the '284 patent includes an alternative circuit that performs the function of allowing circulation of fluid through the motor and between the first and second fluid lines when the pump is not delivering pressurized hydraulic fluid to the motor. The Plaintiffs contend the alternative circuits illustrated in Figures 1, 2, 1B, and 4 should each apply to the disputed phrase in claim 1. With specific reference to Figure 1, Mr. Cartner points to the alternative circulation-allowing means that includes third fluid line (40) with its associated relief valve (42) and flow control orifice (44). Relying upon the specification, Mr. Cartner notes that when the flow of pressurized fluid from the pump to the motor is cut off, fluid flow through motor (20) and between first hydraulic fluid line (14) and second hydraulic fluid line (24) occurs through third fluid line (40) when relief valve (42) is in the open position. ('284 patent, col 4, lines 15-36; col 7, lines 17-34).

Mr. Cartner, further, maintains that the rules governing the Court's construction of the means-plus-function clause at issue requires it to accommodate the alternative structures disclosed in the '284 patent. He urges the Court to give the term under construction its appropriate scope as required by 35 U.S.C. §112, ¶6, encompassing both of the disclosed structures, and any equivalent structures, that perform the recited circulation-allowing function.

Alamo contends the means-plus-function limitation clause of claim 1 cannot logically accommodate Figure 1. Alamo notes that by its own terms, claim 1 requires the circulation-allowing function to be comprised of "a fluid path in said second envelope of said first control valve which fluid path allows a flow of fluid threrethrough without fluid

20

loss." Alamo further points out that the required fluid path through the second envelope of the first control valve can only occur in the structure depicted in Figure 1A, by means of the flow control orifice (74). The alternative structure depicted in Figure 1, urged in application by Mr. Cartner, depicts no means for allowing the required circulation through the second envelope (34) of the first control valve (16).

In this instance, where the patentee urges the Court to construct the means-plus-function clause at issue so as to accommodate the alternative structures disclosed in the patent, the Court looks to the rules of construction as enunciated in prior claim disputes. In so doing, the Court finds the alternative structures disclosed in the specification cannot be used to leverage a broader scope for a claims limitation. Just as it is improper to read limitations from the specification into a claim, so too it is improper to read an express limitation out of a claim based on the specification. "Specifications teach. Claims claim." Oak Technology, Inc. v. Int'l Trade Comm'n, 248 F.3d 1316, 1329 (Fed. Cir. 2001). "While claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims." Novo Nordisk of North Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996); see Laitram IV, 163 F.3d at 1347 ("if everything in the specification were required to be read into the claims ... there would be no need for the claims" (quotation omitted)). When an applicant has filed narrow claims, these claims cannot be broadened based on a broader disclosure in the specification. See Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1359 (Fed. Cir. 2006) ("where a patent specification includes a description lacking a feature, but the claim recites that feature, the language of the claim controls"); Oak Technology, 248 F.3d at 1329 (specification's disclosure of

21

embodiment not covered by claim language does not broaden claim);  <u>Novo Nordisk</u>, 77

F.3d at 1370 n. 8 (noting patentee wrote a broader disclosure than what it claimed).

In this instance, the plain language of claim 1 limited the circulation-allowing

function to an apparatus or structure enabling a fluid path in the second envelope of the

first control valve.  That claim is only, and solely, fulfilled by reference to Figure 1A.

While the specification is more broadly written, the narrower language of the claim

defines and limits the scope of that claim.

Based upon the above analysis, under 35 U.S.C. § 112, ¶6, the Court construes

the means-plus-function phrase "a means for allowing a circulation of fluid through said

motor and between said first and second fluid lines when said pump is disconnected

from said motor" to encompass the function of "allowing a circulation of fluid through

said motor and between said first and second fluid lines when said pump is

disconnected from said motor," because it pertains only to the structure identified in the

specification as Figure 1A which embodies "a fluid path in the second envelope (74) of

the first control valve (70) that connects the first fluid line (14") to the second fluid line

(24") and channels a flow of fluid therethrough."   Mr. Cartner's argument is

unpersuasive that claim 1 includes a second structure, namely Figure 1, with a "third

fluid line (40) which connects first fluid line (14) to second fluid line (24)."   On its face,

claim 1 cannot accommodate the structure proposed in Figure 1 where claim 1 further

requires, immediately following the phrase in dispute, a means for allowing circulation

which is comprised of "a fluid path in said second envelope of said first control valve."

('284 patent, col 8, lines 8-10).  That circulation path for hydraulic fluid is embodied only

in Figure 1A.

22

### 4.  "Said one envelope communicating said first and second hydraulic fluid lines."

This term is found in claim number 4.  The parties chose to present this dispute to the Court on the basis of their briefs and did not present argument on this matter at the Markman hearing.  (Tr. 2).  The two proposed constructions are quite close.

Mr. Cartner, who considers the issue one of semantics, (Tr. 2) proposes the following construction:  "The one envelope providing a connection between the first and second hydraulic lines during the slowing step."  Mr. Cartner maintains that the present participle "communicating" should be construed as "providing a connection between," because the construction "preserves the tense of the claim language and is consistent with the disclosure of the '284 patent."  (Doc. 17, p. 10).  Mr. Cartner further points to the language of the specification of the '284 patent to find the form of communication between the first and second fluid lines provided by the control valve envelope as described using terms such as "channels" ('284 patent, col. 5, line 13), "allows fluid to flow" ('284 patent, col. 6, line 6), and "allows the communication of" ('284 patent, col. 7, line 1).

Alternatively, Alamo proposes the following construction: "The one envelope joins or connects the first hydraulic fluid line to the second hydraulic fluid line during the slowing step."  Alamo maintains the construction is supported by the figures and specification of the '284 patent, specifically the Figure 1A embodiment in claim 4.  In that figure, the flow control orifice (76) is located in the second envelope (74) of the control valve (72).  During the slowing step, as represented by Figure 1A, the only structure to accomplish the transfer of fluid from the second hydraulic fluid line (24") to

23

the first hydraulic fluid line (14") is the flow control orifice (76) located in the second envelope (74).

The Court concludes the Plaintiffs' phrase "providing a connection between" leaves an unacceptable ambiguity over whether the flow control orifice in the second envelope is the only structure which accomplishes the transfer of hydraulic fluid between the first and second hydraulic lines during the slowing step.  Figure 1 also provides a flow control orifice (44) in a third hydraulic line (40) which regulates the flow of hydraulic fluid between the first and second hydraulic lines.  The Court finds the plain language of claim 4 is not directed to the Figure 1 embodiment but to the Figure 1A embodiment which depicts the slowing step of claim 4.  ('284 patent, col. 8, lines 38-47).

Based upon the above analysis, the Court construes the term "said one envelope communicating said first and second hydraulic fluid lines" to mean: "The one envelope joins or connects the first hydraulic fluid line to the second hydraulic fluid line during the slowing step."  The two proposed constructions are similar, but Alamo's proposed construction avoids the ambiguity, found in Mr. Cartner's proposed construction, that more than one structure exists to provide the transfer of fluid from the first to the second hydraulic fluid line.  The Court's adopted construction, as urged by Alamo, maintains fidelity to the language of claim 4 and better describes the Figure 1A structure singularly embodied in claim 4.

**5.**  "said flow control orifice being **constantly operative.**"

24

This term is found in claim numbers 5 and 12.  Claim 5 of the '284 patent requires "a flow control orifice located in said third fluid line, said flow control orifice being **constantly operative**, said third fluid line allowing a flow of hydraulic fluid from said second fluid line to said first fluid line even when said control valve is in a closed position, as regulated by said relief valve, and wherein said flow control orifice limits the speed with which such flow takes place."  ('284 patent, col. 8, lines 64-68; col. 9, lines 1-4) (emphasis added).  Claim 12 of the '284 patent requires "providing a flow control orifice in said third fluid line, said flow control orifice being **constantly operative** to throttle fluid flow through said third fluid line."  ('284 patent, col. 10, lines 23-26) (emphasis added).

Mr. Cartner's proposed construction of the limitation "said flow control orifice being constantly operative," found in claims 5 and 12 is: "The flow control orifice is always connected to the third fluid line, as opposed to being connected only through the actuation of a solenoid."

Mr. Cartner draws his support for this construction proposal from the '284 patent prosecution history.  The term "constantly operative" was added to claims 5 and 12 in an amendment filed on 18 January 1991, for the parent application of the application underlying the '284 patent.  (Doc. 17; Moy Dec. Ex. C).  In the 18 January Amendment, Mr. Cartner's counsel successfully sought to distinguish claim 5 (then referred to as "claim 9") of the '284 patent over a prior patent, Stoufflet et al. – U.S. Patent No. 4,194, 365.  ("Stoufflet Patent") (Doc. 17; Moy Dec. Ex. D).  In distinguishing the Stoufflet patent, Mr. Cartner's counsel maintained:

25

> Stoufflet et al. neither teaches nor discloses a hydraulic motor deceleration system having *a hydraulic circuit in which a relief valve is located in a third fluid line and a flow control orifice, which is **constantly operative**, rather than being solenoid controlled* as in Stoufflet et al., is also located in the third fluid line in a position downstream from the relief valve, such as is recited in independent claim 9.  It is evident that the flow control orifice 53 in Stoufflet et al. is neither located in the same fluid line as is the relief valve 55, 57 nor is the flow control orifice positioned downstream thereof.  In addition, claim 9 recites that the third fluid line allows a flow of hydraulic fluid between the first and second fluid lines as regulated by the relief valve and such flow takes place through the flow control orifice located in the third fluid line, which flow control orifice is **constantly operative**.  It is evident that there is no teaching or disclosure in Stoufflet et al. of having a single fluid line which contains both a relief valve and a flow control orifice which flow control orifice is **constantly operative** such as is recited in independent claim 9.

(18 January 1991 Amendment, p. 13, emphasis added).

Mr. Cartner's proposed construction suffers in two aspects.  First, Mr. Cartner relies upon an aspect of the prosecution history, which itself is not explanatory, to expand the term "constantly operative" to instead mean "always connected."  Such an expansive reading runs counter to claim construction principles which direct the courts to decline to enlarge a claim scope from its plain and ordinary meaning based on a patent's prosecution history.  SuperGuide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870, 888 (Fed. Cir. 2004).  Second, Mr. Cartner's proposed construction introduces a term – "actuation of the solenoid" – that is entirely unexamined in, and extraneous to, the claim itself.

Alamo proposes reading the term "constantly operative" as "the flow control orifice continuously slows fluid flow when the first control valve is in the open or closed position."

Because the term "constantly operative" is not mentioned in the '284 patent specification and not explained in the prosecution history, Alamo relies upon an extrinsic definition of "constantly" to render its meaning as "continually occurring."  See American Heritage Dictionary of the English Language, 4th Edition; see also L.B. Plastics, Inc. v. Amerimax Home Prods., Inc., 499 F.3d 1303, 1308 (Fed. Cir. 2007).

Alamo further bolsters its proposed construction by referring to the plain language of the claim as well as to the specification.  Claim 5 recites that the hydraulic motor deceleration system consists, in pertinent part of:

> a flow control orifice located in said third fluid line, said flow control orifice
> being constantly operative, said third fluid line allowing a flow of hydraulic
> fluid from said second fluid line to said first fluid line **even** when said
> control valve is in a closed position, as regulated by said relief valve, and
> wherein said flow control orifice limits the speed with which such flow
> takes place.

('284 patent, col. 8, lines 64-68; col 9., lines 1-3, emphasis added).  In the description, Alamo points to the recitation that "[t]he third fluid line allows a flow of hydraulic fluid between the first and second fluid lines **even** when the control valve is in a closed position."  ('284 patent, col. 2, lines 16-19, emphasis added).

Alamo focuses on the term "even" as used in claim 5, and suggests the term requires that the third fluid line allows a flow of hydraulic fluid from the second fluid line to the first line when the control valve is in both an open or closed position.  Alamo maintains its proposed claim construction gives meaning to the term "even" which is not recognized in Mr. Cartner's proposed construction.  Pursuant to the claims construction principle, delineated in Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005), that directs a court to interpret claims so that no term

27

becomes "superfluous," Alamo argues that its claim construction is superior to the Plaintiffs' for taking into account the meaning of the term "even" in claim 5.

Based upon the above analysis, the Court construes the term "constantly operative" to mean "the flow control orifice continuously slows fluid flow when the first control valve is in the open or closed position."  That construction bears greater fidelity to the language of claim 5 than does Mr. Cartner's proposed construction.  The Court is persuaded to adopt the claim construction that gives meaning to all the terms of the claim over one that does not do so.  Further, the Court will extend this adopted construction to the term "constantly operative" in claim 12 under the canon of claim construction that "claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Research Plastics, Inc. v. Federal Packaging Corp., 421 F.3d 1290, 1295 (Fed. Cir. 2005) (citing Phillips, 415 F.3d at 1313-14, and Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir.2001)).

28

## IV.  CONCLUSION

For the reasons set forth above, the terms at issue in the '284 patent are

construed as follows:

- The term "located in said . . . fluid line" in claim numbers 1, 5 & 12 means "located such that the associated fluid line enters and exits the [first control valve/relief valve; flow control orifice] that is 'in' the associated fluid line."

- The term "a flow control orifice located in said fluid path" in claim number 1 means "a flow control orifice is located in the fluid path that connects the first and second hydraulic fluid lines.  The term "fluid path" is further limited by the means-plus-function clause (circulation allowing means) of claim 1 and the "wherein" clause immediately following that means-plus-function clause."

- The term "when said pump is disconnected from said motor" and "when the motor is disconnected from a hydraulic pump" in claim numbers 1, 4 & 12 means "the pump and motor are not connected, such that fluid cannot flow from the pump to the motor."

- The term "a means for allowing a circulation of fluid through said motor and between said first and second fluid lines when said pump is disconnected from said motor" in claim number 1 means the function of "allowing a circulation of fluid through said motor and between said first and second fluid lines when said pump is disconnected from said motor" and the function only corresponds to the structure embodied in Figure 1A in which "a fluid path in the second envelope (74) of the first control valve (70) that connects the first fluid line (14") to the second fluid line (24") and channels a flow of fluid therethrough."

- The term "said one envelope communicating said first and second hydraulic fluid lines" in claim 4 means "the one envelope joins or connects the first hydraulic fluid line to the second hydraulic fluid line during the slowing step."

- The term "said flow control orifice being constantly operative" in claim numbers 5 & 12 means "the flow control orifice continuously slows fluid flow when the first control valve is in the open or closed position."

29

- The term "as regulated by said relief valve" in claim numbers 5 & 12 means "relief valve controls whether and how much fluid may flow."

- The term "firt" in claim number 4 means "first."

IT IS SO ORDERED.

                                                    /s/Lesley Wells
                                                    UNITED STATES DISTRICT JUDGE