**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JACK O. CARTNER, and ) CASE NO.     1:07-cv-1589
MOTRIM, INC., )
                     ) JUDGE WELLS
          Plaintiffs, )
                     ) MAGISTRATE JUDGE VECCHIARELLI
      v. )
                     ) REPORT AND RECOMMENDATION
ALAMO GROUP, INC., )
                     ) Doc. No. 76
          Defendant. )

     This case is before the magistrate judge on referral.  Before the court is the

motion of defendant, the Alamo Group, Inc. ("Alamo"), for an award of $608,899.55 in

attorney's fees and costs pursuant to 35 U.S.C. § 285 ("Motion").  Doc. No. 76.

Plaintiffs, Jack O. Cartner ("Cartner") and Motrim, Inc. ("Motrim"), oppose Alamo's

motion ("Response").  Doc. No. 79.  For the reasons given below, Alamo's motion

should be **GRANTED** in part and **DENIED** in part.  Alamo should be awarded

$358,516.44 in attorney's fees and costs from June 17, 2009 through December 21,

2011.

I

     The parties do not dispute the following relevant facts.

*A.  The '284 patent*

     On March 20, 1993, the United States patent office issued to Cartner United

States Patent No. 5,197,284 ("the '284 patent"; Complaint, Doc. No. 1, attachment 1), a

patent for a "Hydraulic Motor Deceleration System."  Cartner issued an exclusive

license to Motrim for manufacture and sale of the device described by the patent.

The '284 patent describes a system for decelerating an hydraulic motor.  The

patent's description of the background of the invention follows:

> The present invention pertains to hydraulically powered equipment.  More
> particularly, this invention relates to the use of a deceleration circuit for a
> hydraulic motor.
> The invention finds particular application in hydraulic motors which are
> used to power mowers and ditchers or the like utilized in road maintenance
> equipment.  However, it should be appreciated that the hydraulic motor
> deceleration system also finds application in other equipment in which a hydraulic
> motor is employed.
> As is well known, hydraulically driven motors are currently utilized to
> power mowers, ditchers and like equipment especially equipment of the type that
> is secured to articulated boom assemblies pivotally connected to a tractor and
> used to maintain the berms of roads and the like.  Currently, in such equipment,
> when hydraulic power is shut off to the motor, the motor, and with it the grass
> cutting blade or ditching blade which it drives, continues to freewheel (since the
> control valve of the motor generally has a motoring spool) when communication
> is interrupted between the hydraulic pump and the motor.  If, on the other hand, a
> non-motoring spool were to be provided, the motor would come to a precipitous
> stop once the control valve would be actuated to the off position so that
> communication would be blocked between the hydraulic pump and the motor.
> Neither one of these alternatives is particularly desirable.  When the motor is
> allowed to freewheel, it does not come to a stop very quickly and the cutting
> blade may damage something while the boom arm to which the blade housing is
> secured is being moved.  On the other hand, if the motor and the blade would
> come to a precipitous stop, great strains would be placed on the motor as well as
> the fasteners connecting the cutting blade to the motor and the blade would likely
> break its fasteners and fly off the motor.
> Accordingly, it has been considered desirable to develop a new and
> improved hydraulic motor deceleration system which would overcome the
> foregoing difficulties and others by providing better and more advantageous
> overall results.

The '284 patent, col. 1, lines 13-54.

The '284 patent includes three principle components:  a pump, an hydraulic

motor, and a motor hydraulic circuit connecting the pump and the motor.  *See* Figure 1A

2

('284 patent, Abstract).[1] The first line of the motor hydraulic circuit (14") runs from the pump to the first control valve, then from the first control valve to an inlet of the motor. The first control valve controls the flow of fluid from the pump to the motor inlet.  The second line of the circuit (24") then runs from the motor outlet back to the first control valve.  Included in the first control valve is an orifice (# 76) in the fluid path that controls the flow of fluid between the first and second lines within the first control valve.  An envelope in the valve (# 74) prevents fluid from flowing out of the first and second lines and also prevents fluid from flowing from the pump to the motor when the motor is disconnected from the pump.

Figure 1 shows the device pictured in Fig. 1A with a second deceleration system added.  The additional deceleration system is a third fluid line (# 40 in Fig. 1), connecting the line running from the outlet of the motor to the first control valve to the line running from the first control valve to the inlet of the motor.  This third fluid circuit allows fluid to flow from the second line to the first line without entering the first control valve.  The third fluid line includes a flow control orifice (# 44) that controls the flow of fluid.

The '284 patent relates the specifications of six embodiments of an hydraulic motor deceleration circuit (Figures 1, 1A, 1B, 2, 3, 4 of the patent)[2] and concludes with twelve claims.  The patent describes the figures accompanying the claims as "illustrating preferred and alternate embodiments of the invention only and not for

---

[1]  All figures referenced in the text are appended to the magistrate judge's Report and Recommendation, March 30, 2011, doc. no. 67.

[2]  The numbered figures here refer to the figures accompanying the '284 patent.

3

purposes of limiting same." ('284 patent, col 3, lines 35-37). The specification names Figure 1 as the first preferred embodiment of the hydraulic circuit diagram of a deceleration system hydraulic circuit, Figure 3 as the second preferred embodiment, Figure 2 as the first alternate embodiment, Figure 1A as the second alternate embodiment, Figure 1B as the third alternate embodiment, and Figure 4 as the fourth alternative embodiment.

Plaintiffs' complaint alleged infringement of claims 1, 4, 5, and 12 of the '284 patent against Alamo based on Alamo's production and sale of several industrial mowers.[3] Claim 1 of the patent is directed to "[a] hydraulic control system"; claim 5 is directed to "[a] hydraulic motor deceleration system"; and claims 4 and 12 are both directed to "[a] method for decelerating a hydraulic motor when the motor is disconnected from a hydraulic pump." Plaintiffs alleged that certain industrial mowers made by Tiger Corporation, an operating company within Alamo, infringed Claims 5 and 12 of the '284 patent. Plaintiffs also alleged that certain industrial mowers made by Alamo Industrial, another operating company within Alamo, infringed Claim 12.

Claim 1 relates to the embodiment disclosed in Figure 1A of the '284 patent. The means-plus-function clause of claim 1 describes a hydraulic control system comprised as follows:

> a means for allowing a circulation of fluid through said motor and between said first and second fluid lines when said pump is disconnected from said motor, wherein said means for allowing circulation comprises a fluid path in said second envelope of said first control valve which fluid path allows a flow of fluid therethrough without fluid loss, and a means for slowing a flow of fluid between

---

[3] The complaint also asserted infringement upon Cartner's United States Patent No. 7,185,479 ("'479 patent"). Plaintiffs subsequently moved to dismiss claims of infringement based on the '479 patent from this action, and the court granted the motion.

4

> said first and second fluid lines wherein said means for slowing comprises a flow
> control orifice located in said fluid path in said second envelope of said first
> control valve.

'284 patent, col 8, lines 5-16.  Plaintiffs unsuccessfully argued in the Markman hearing

that Claim 1 also related to the third fluid line depicted in Figure 1.  The court found that

the "means plus function" description in Claim 1 precluded relation to a system for

allowing circulation through the motor and between the first and second lines if that

system were outside the first control valve.

Claim 4 of the patent also relates to the embodiment disclosed in Figure 1A. This

claim directs a method for decelerating a hydraulic motor when the motor is

disconnected from a hydraulic pump. This method operates as follows:

> slowing the speed of rotation of said motor by restricting the rate of flow of fluid
> through said first and second fluid lines wherein said step of slowing the speed
> comprises the subsidiary step of providing a flow control orifice (76) in one
> envelope (74) of said first valve (70), said one envelope (74) communicating said
> first and second hydraulic fluid lines, while preventing a flow of fluid out of said
> first and second fluid lines and also preventing a flow of fluid from said pump to
> said motor.

'284 patent, col. 8, lines 38-47.  The court has construed the term "said one envelope

communicating said first and second hydraulic fluid lines" to mean "[t]he one envelope

joins or connects the first hydraulic fluid line to the second hydraulic fluid line during the

slowing step."  Memorandum of Opinion and Order ("*Markman* order"), May 21, 2008,

Doc. No. 25, p. 23.  The court adopted this construction to avoid any ambiguity that

might allow an interpretation of Claim 4 to include the third fluid line depicted in Figure

1.

Claim 5 relates to the preferred embodiment in Figure 1.  It directs a third

hydraulic fluid line between the first and second fluid lines.  The third fluid line includes,

*inter alia*, a relief valve.  It also includes a flow control orifice, described as follows:

> said flow control orifice located in said third fluid line, said flow control orifice being constantly operative, said third fluid line allowing a flow of hydraulic fluid from said second fluid line fluid line to said first fluid line even when said control valve is in a closed position, as regulated by said relief valve, and wherein said flow control orifice limits the speed with which such flow takes place.

'284 patent, col. 8-9, lines 64-5.  The court construed the term "constantly operative" to mean "the flow control orifice continuously slows fluid flow when the first control valve is in the open or closed position."  *Markman* order at 28.  Moreover, the court extended this construction to the term "constantly operative" in Claim 12.  Plaintiffs appealed this construction, and the Federal Circuit vacated this construction and found that the flow control orifice could not slow fluid flow when the control valve was in the closed position because there could be no fluid flow in through the orifice under those circumstances. *See Cartner et al. v. Alamo Group, Inc.*, 2009 WL 1676153, at *3 (Fed. Cir. June 17, 2009).

Claim 12 of the patent relates to Figure 1 and directs a method for decelerating an hydraulic motor when the motor is disconnected from the pump.   This method employs both the flow of fluid from the second fluid line to the first fluid line within the first control valve, as described in Claim 1, and also employs the flow of fluid from the second fluid line to the first fluid line through the third fluid line, as described in Claim 5.

B.      *Procedural history of this litigation*

Plaintiffs filed a complaint on May 30, 2007 alleging that Tiger and Alamo mowers infringed on the '284 patent and United States Patent No. 7,185,479 ("the '479 patent").  Alamo supplied Cartner with the Tiger mower schematics early in the litigation. On March 28, 2008, plaintiffs dismissed their claims of infringement of the '479 patent.

6

The court held a Markman hearing on May 13, 2008.  On May 21, 2008, the court issued a Memorandum of Opinion adopting the claim constructions described above. On June 5, 2008, plaintiffs filed a motion for reconsideration of the court's construction of "constantly operative."  The court denied this motion on September 23, 2008.  The parties filed a joint proposed stipulation of patent invalidity on October 24, 2008, and the court entered final judgment declaring the invalidity of claims 5 and 12 of the '284 patent on October 29, 2008.

On November 14, 2008, plaintiffs filed a notice of appeal to the Federal Circuit. On appeal, the Federal Circuit vacated this court's opinion regarding the construction of "constantly operative," substituted its own construction as described above, and vacated the finding of invalidity of claims 5 and 12 of the '284 patent.  On July 29, 2009, the Federal Circuit remanded the case for further proceedings.

On February 22, 2010, the parties filed a joint motion for entry of consent judgment.  On March 2, 2010, the court entered consent judgment in favor of defendant and against plaintiff as to all remaining claims.  On March 16, 2010, Alamo moved to declare this case exceptional pursuant to 35 U.S.C. § 285 ("§ 285") and for attorney's fees pursuant to that section.  Plaintiffs opposed Alamo's motion.

On September 23, 2011, the court granted Alamo's motion.  The court found that plaintiffs' allegations of infringement against the Tiger mowers were frivolous because (1) plaintiffs unreasonably ignored the requirement in Claim 12 that during deceleration the flow of fluid between the first and second fluid lines occur without a loss of fluid, and (2) plaintiffs unreasonably ignored the requirement in Claims 5 and 12 that a relief valve regulate the flow between the first and second fluid lines.  The court further found that

7

plaintiffs should have known that their claims were without merit upon examination of the schematics of the accused mowers.  In addition, the court also found that plaintiffs' allegations of infringement against both the Tiger and Alamo mowers were frivolous because plaintiffs unreasonably maintained a construction of Claim 12's specification "when the motor is disconnected from the hydraulic pump" against the Tiger and Alamo mowers after that construction was rejected by the court.  Finally, the court found that Alamo had demonstrated by clear and convincing evidence that plaintiffs knew or should have known that their arguments in these respects were baseless.  The court, therefore, concluded that plaintiffs' had prosecuted their case in bad faith, which was sufficient to find exceptional circumstances justifying an award of attorney fees pursuant to § 285.

## II.  Attorney's fees and Costs

Alamo now moves for  $608,899.55 in attorney's fees and costs.[4]  Alamo calculates these fees and costs from August 10, 2007, the date on which it provided plaintiffs a copy of the Tiger mower schematics.[5]  Alamo contends that this is the date on which plaintiffs should have known that their complaint was frivolous because, as the court has already found, no one could reasonably have believed that the Tiger mower infringed claims 5 or 12 of the '284 patent after examining the schematics for the Tiger mower.

Alternatively, Alamo suggests March 14, 2008 as the date on which plaintiffs

---

[4]  All of the costs sought in Alamo's motion exclude non-taxable costs.  The parties reached an agreement regarding these costs, and those costs are no longer at issue.

[5]  *See* Letter of Travis Anderson to Cartner, August 10, 2007, Declaration of Steven M. Auvil ("Auvil Decl."), Doc. No. 54, Exh 5.

8

should have known their complaint was frivolous, as this was the date on which the Joint Submission of Claim Construction was filed.  Doc. No. 15.  Alamo points out that the court has found that plaintiffs' complaint was frivolous, in part, because it was made baseless by the parties' Joint Submission of Claim Construction.  In that filing, the parties agreed that the relief valve in the third fluid line in Cartner's patent "controls whether and how much fluid may flow" in the third hydraulic fluid line.  Alamo argues that no reasonable person could believe that the brake relief valve in the Tiger mower, which plaintiffs identified as corresponding to the relief valve in the Cartner patent, could control "whether and how much fluid may flow" in the Tiger mower makeup line, the line plaintiffs identified as corresponding to the third hydraulic fluid line.  Consequently, Alamo contends, by March 14, 2008 plaintiffs knew that their assertion that the Tiger mower infringed the limitation introduced by the Cartner relief valve was frivolous.

As a second alternative, Alamo argues that it should be awarded fees and costs from May 21, 2008, the date of the court's *Markman* order construing the '284 patent. 26).  Alamo notes that the court's *Markman* order found the limitation in claim 12, "when the motor is disconnected from a hydraulic pump," to mean "the pump and motor are not connected such that fluid cannot flow from the pump to the motor."  *Markman* order at 19.  Alamo notes that Cartner argued in its opposition to Alamo's motion to declare the case extraordinary that the limitation in claim 12 meant "the pump is not delivering pressurized hydraulic fluid to the motor," despite the court's *Markman* order to the contrary.

Plaintiffs respond that attorney's fees and costs should be awarded beginning June 17, 2010, the date on which the Federal Circuit overruled this court's construction

9

of "constantly operative" with respect to the flow control orifice.  In support of this claim, plaintiffs assert that they could not have known that their claims were frivolous merely by reading the Tiger schematics.  Plaintiffs contend that they required the deposition of Alamo's expert in June 2008 before they could know that their claims were baseless.  Thus, they conclude, they should not be assessed attorney's fees and costs until that time.  The court has already found, however, that a reasonable reading of the Tiger schematics reveals that the Tiger mower did not infringe on (1) the requirement in Claim 12 that during deceleration the flow of fluid between the first and second fluid lines occur without a loss of fluid, and (2) the requirement in Claims 5 and 12 that a relief valve regulate the flow between the first and second fluid lines.  Order, September 23, 2011 ("September 23 Order"), Doc. No. 72, pp. 7-8.  Indeed, the court has explicitly rejected the very argument that plaintiffs assert here.  *Id.* at 8.  Consequently, the argument that plaintiffs required a deposition before they could know that these claims were baseless is itself frivolous, given the court's previous findings.

More sound is plaintiffs' argument that June 17, 2009 is the appropriate date because it was the earliest date upon which all issues of claim construction had been resolved.  Plaintiffs timely requested reconsideration of the court's *Markman* order, timely appealed, and won their appeal, albeit not on a construction implicated in the court's September 23 Order.  Plaintiffs had a right to resolve a claim construction which they believed to be erroneous, even if resolution of that construction did nothing to make their claims of infringement any more meritorious.  Having resolved all issues of claim construction, plaintiffs' persistence in prosecuting a case that was now clearly

10

without merit was vexatious and unjustified.[6]  *See Glaxo Group Ltd. v. Apotex, Inc.*, 376

F.3d 1339, 1350 (Fed. Cir. 2004) ("This court has recognized many types of misconduct

that may create an exceptional case for purposes of awarding fees, including . . .

litigation misconduct such as vexatious or unjustified litigation or frivolous filings, and

willful infringement.").

While each of Alamo's suggested dates has some merit as the dates from which

attorney's fees and costs should be awarded, given the September 23 Order, June 17,

2009 is the date after which plaintiffs' conduct was most clearly unjustified.  For this

reason, Alamo should be awarded attorney's fees and costs from June 17, 2009

forward.

A.    *Applicable law in assessing the reasonableness of fees*

Once a court determines that a party is entitled to fees as a prevailing party, the

primary concern is whether the fees are reasonable.  *Blum v Stenson*, 465 U.S. 886,

893-95 (1984); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).  In determining a

reasonable fee, the starting point is to determine the "lodestar," calculated by multiplying

the number of hours reasonably expended by a reasonable hourly rate.  *Hensley v.

Eckerhart*, 461 U.S. 424, 434 (1983); *Isabel v. Memphis,* 404 F.3d 404, 415 (6th Cir.

2004).  The party seeking attorney's fees bears the burden of proving the

---

[6]  As Alamo notes, plaintiffs' prosecution of the case was particularly unjustified when, in their response to Alamo's motion to declare the case exceptional, plaintiffs asserted a construction for the limitation in claim 12, "when the motor is disconnected from a hydraulic pump," that was entirely contrary to the construction found by the court in its Memorandum Opinion and Order of May 21, 2008.  To justify the discredited construction, plaintiffs asserted that they could have prevailed in their claim under the doctrine of equivalents, an argument plaintiffs had long since waived.  This manifestly meritless argument needlessly prolonged adjudication of this case.

reasonableness of the hours and the rates claimed.  *Hensley*, 461 U.S. at 433-34.  A prevailing party is not entitled to recover for "hours that are excessive, redundant, or otherwise unnecessary."  *Id.* at 434.

The court determines the reasonableness of the claimed hourly rates by reference to the prevailing market rate in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel.  *See Johnson v. Clarksville*, 256 F. App'x 782, 783 (6th Cir. 2007), *citing Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989).  A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys."  *Blum*, 465 U.S. at 897 (internal quotes and citation omitted); a*ccord Geier*, 372 F.3d at 791.  Reasonable hourly rates "do not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question."  *Coulter v. Tennessee*, 805 F.2d 146, 149 (6th Cir. 1986).  The *Coulter* court stated:

> The statutes use the words "reasonable" fees, not "liberal" fees.  Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region.  Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate.  We therefore apply the principle that hourly rates for fee awards should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question.

*Id.* (footnote omitted).   Courts may use state bar surveys and an attorney's "well-defined billing rates" as indicators in determining a reasonable hourly rate.  *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 619 (6th Cir. 2007); *Hadix  v. Johnson*, 65 F.3d 532, 536 (6th Cir. 1995) (finding that "normal billing rates usually 'provide an efficient and fair short cut for determining the market rate.'" (citation omitted)).

12

The party seeking attorney's fees also bears the burden of proving the reasonableness of the hours billed and must exclude hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. Attorneys seeking fees must maintain time records that are sufficiently detailed to allow the court to determine the reasonableness of the hours expended with a high degree of certainty that the hours were actually expended. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008).[7] There can be three different types of issues concerning excessive hours: (1) factual questions about whether the work was actually performed; (2) legal questions about whether the work performed was sufficiently related to the issues on which the plaintiff prevailed; and (3) mixed questions involving billing

_____

[7] The Sixth Circuit has noted:

Courts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where the attorney did not "maintain contemporaneous records of his time or the nature of his work," *Keener v. Dep't of the Army*, 136 F.R.D. 140, 147 (M.D.Tenn. 1991), *aff'd on decision of the district court by Keener v. Dep't of the Army*, No. 91-5442, 1992 WL 34580, 1992 U.S.App. LEXIS 2822 (6th Cir. Feb. 24, 1992), and where billing records "lumped" together time entries under one total so that it was "impossible to determine the amount of time spent on each task." *Cleveland Area Bd. of Realtors [v. Euclid]*, 965 F. Supp. [1017,] at 1021 [(N.D. Ohio 1997)]. On the other hand, this court has upheld an award of attorney fees and found billing records to be adequate where entries made by counsel "were sufficient even if the description for each entry was not explicitly detailed," *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005), and where the attorney provided the court with computerized calendars and file information indicating the dates and times of work performed. *Sigley v. Kuhn*, Nos. 98-3977/99-3531, 2000 WL 145187, 2000 U.S.App. LEXIS 1465 at *20-21 (6th Cir. Jan. 31, 2000); *see also Anderson v. Wilson*, 357 F.Supp.2d 991, 999 (E.D.Ky.2005) (holding that the Plaintiffs had satisfied their burden to provide sufficiently detailed billing records where counsel provided the court with "itemized statements describing the subject matter, the attorney, the time allotment, and the charge for all work done on Plaintiffs' case").

*Imwalle*, 515 F.3d at 553.

13

judgment and whether counsel spent too much time on particular tasks or unnecessarily duplicated the work of co-counsel.  *Coulter*, 805 F.2d at 150-51.  A trial court's determination that hours are excessive or duplicative is a finding of fact subject to a clearly erroneous standard of review.  *Wayne v. Sebring*, 36 F.3d 517, 532 (6th Cir. 1994).  Furthermore, where the trial court determines that hours are excessive or duplicative, it may make "a simple across-the-board reduction by a certain percentage." *Hudson*, 130 F.3d at 1209 (approving an across-the-board reduction of 25% for duplication of effort),[8] *citing Coulter*, 805 F.2d at 152 (approving a 50% across the board reduction for certain items due to multiple representation as the danger of duplication and wasted resources is difficult to measure); *see also Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 764-65 (N.D. Ohio 2010) (Lioi, J.) (finding that a 50% reduction in fees "is a fair and expeditious solution to determining the sum total of reasonable fees") (collecting cases).

Once a court has calculated the lodestar (*i.e.*, reasonable hours times a reasonable rate), the court may adjust the final fee award upwards or downwards and should consider the twelve factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with

---

[8] *Hudson* was abrogated on other grounds by *Pollard v. E.I. du Pont Nemours & Co.*, 532 U.S. 843 (2001).

the client; and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19.[9]  Each case is fact specific and there is no precise

formula for determining fees.  *Hensley*, 461 U.S. at 436.  The most critical factor is the

degree of success obtained.  *Id.*  However, there is a "strong presumption that the

lodestar represents the reasonable fee."  *Burlington v. Dague*, 505 U.S. 557, 562

(1992).

B.     *Hourly rates*

        Alamo argues that the rates for each of its attorneys and paralegals billing in this

case were reasonable for legal work in intellectual property, given the degree of

experience of each attorney.  Alamo provides the following support for this argument:

        1.     The hourly rates for each attorney who billed Alamo for legal work in this

                case, including rate changes for each attorney from before October 1,

                2007 until after October 1, 2011, Auvil Decl., Doc. No. 78, Exh. 1;

        2.     A description of the level of experience of each attorney who billed Alamo,

                Auvil Decl. at 2-4;

        3.     The declaration of Auvil that the rates billed were the standard billing rates

                for each individual and that the rates were developed through an annual

                analysis of relevant market data, Auvil Decl. at 5; and

        4.     An excerpt from the American Intellectual Property Law Association, *2011*

---

        [9]  In *Hensley*, 461 U.S. at 432, the Supreme Court recognized the 12 *Johnson* factors, but noted that these factors are usually subsumed within the calculation of reasonable hours at a reasonable rate.

15

*Report of the Economic Survey , Online Access* ("Report"),[10] including the hourly billing rates for partners in private firms, associates in private firms, and all individuals, expressed as averages and in quartiles, for 2008 and 2010, Auvil Decl., Exh. 2.

All of Alamo's attorneys worked for Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"). They billed from a high range of $395-525 per hour for Auvil, a partner with 17 years' experience and Chair of Benesch's Intellectual Property Practice Group, to a low range of $185-200 for Angela R. Gott, a junior associate.[11] Associates billed from a low of $185 for Gott to a high of $300 per hour for senior intellectual property associate, Greg Kolocouris. Benesch also billed in a range from $150-190 for the work of an intellectual property paralegal with ten years' experience and in a range from $80-155 for the work of an intellectual property paralegal with four years' experience.

The Report gives the range in quartiles for a partner in a private firm in 2010 as $441-535 per hour and for associate as $320-395 per hour. As plaintiffs do not challenge the reasonableness of the hourly rates billed and as the attorneys' rates are roughly within the appropriate ranges described in the Report, they are reasonable.

C.    *Hours billed*

In support of the reasonableness of the number of hours billed, Alamo provides the following:

---

[10]  This may be found at http://aipla.org/learningcenter/library/books/econsurvey/2011/Pages/default.aspx

[11]  Benesch also billed $160-200 per hour for the work of John J, Thuermer, a law clerk who had graduated law school during the course of the litigation but had not as yet passed the Ohio Bar Examination.

16

1.     All monthly billing invoices submitted by Benesch from August 20, 2007 through March 16, 2010, Auvil Decl., Exh. 3, representing time spent litigating the merits of the case;

2.     Benesch's timekeeping records from February 24, 2010 through December 21, 2011, Second Declaration of Auvil ("Second Auvil Decl."), Doc. No. 82, Exh. 9 (updating Exh. 5 of the Auvil Declaration), representing time spent to recover attorney's fees;

3.     Tables taken from the Report describing fees and all costs of litigating patent infringement cases, with results broken down by (a) region, (b) extent of the litigation, (c) amount in dispute, (d) number of attorneys involved in the litigation, and (e) means and quartile distributions for each of the above categories, Auvil Decl., Exh. 4; and

4.     Citation to a court award of attorneys' fees and costs in a comparable case, Brief in Support, Doc. No. 77, 6-7.

Rather than justifying the number of hours billed independently of other variables, Alamo assumes, correctly, that the rates charged are reasonable, then it argues that the total amount charged for the representation was also reasonable.  This approach is an adequate indirect measure of the reasonableness of the number of hours charged.

Alamo cites cases in which the total amount charged justifies its attorneys' total charges for various stages of the present litigation.  As regards the reasonableness of fees and costs expended after remand from the Federal Circuit, Alamo cites the award of fees in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011), as justifying its request for fees and costs.  In *Eon-Net*, a case litigated in western Washington state,

17

the Federal Circuit affirmed the district court's award of $489,150.48 in fees for time

expended in litigating the case after remand, including addressing the merits of the case

and litigating the issue of attorney's fees.

Alamo claims $343,054.66 in attorney's fees and $15,461.78 in costs from June

17, 2008, the date the Federal Circuit issued its opinion, through December 21, 2011.[12]

Plaintiffs, however, estimate that Alamo is due $222,529.50 in attorney's fees and

$12,414.96 in costs going forward from the Federal Circuit's opinion.  Plaintiffs arrive at

this figure by including only those fees and costs incurred between the Federal Circuit's

opinion and the entry of consent judgment in favor of Alamo and against plaintiffs on

March 2, 2011.  *See* Summary, "Expenses Accrued before Consent Judgment," row 5.

Plaintiffs do not explain why they disregarded those fees and costs incurred after entry

of consent judgment.  Plaintiffs do not challenge Alamo's right to seek attorney's fees

for fees and costs incurred in seeking attorney's fees, and Alamo cites case law

supporting an award of such fees.  *See Eon-Net*, 653 F.3d 1314.  Indeed, plaintiffs' only

objection to such fees is that the total amount of fees incurred in obtaining attorney's

fees is too high by 25% (see *infra*).  Consequently, plaintiffs' grounds for excluding fees

and costs incurred after entry of consent judgment is unexplained and not known by this

---

[12] The amounts are summarized in the table entitled "Summary of Fees and Costs Incurred by Defendant Alamo Group" ("Summary"), Second Auvi Decl., Exh. 10.  That table includes all fees and costs from the Federal Circuit's opinion through December 21, 2011. An earlier version of that table, "Summary of Fees and Costs Incurred by Defendant Alamo Group," Auvil Decl., Exh. 8, included all fees and costs just through November 8, 2011. Thus, the later table is an update of the earlier table.  Alamo filed the earlier table on the same day it filed its motion.  Thus, it was available to plaintiffs when they drafted their response brief.
　　The later Summary also includes columns which clarify that Alamo already has deducted from the costs it seeks those taxable costs negotiated with plaintiffs and which plaintiffs have already paid.

court.

D.    *Costs arising from the representation*

In support of the reasonableness of the costs arising from the representation, Alamo provides the following:

1.    A table of costs incurred from the inception of the case up to March 16, 2010 and billed to Alamo, Auvil Decl., Exh. 6; and

2.    A table of costs incurred from February 24, 2010 through December 21, 2011, Second Auvil Decl., Exh. 8.

Alamo requests $15,461.78 in costs arising from its representation.  None of the amounts listed in the tables of costs seems unusual, and the total amount appears to be reasonable, given the extent of the litigation.  Moreover, plaintiffs do not challenge any particular items of costs or object to the overall amount, except insofar as it might contain non-taxable costs (see *infra*).  For these reasons, Alamo's request for costs in the amount of $15,461.78 should be granted.

E.    *Plaintiffs' objections*

Plaintiffs make two objections to paying attorney's fees and costs incurred after the Federal Circuit issued its opinion.  First, they object that the taxable costs listed in Exhibit 6 as still owed already have been paid.  Alamo acknowledges this, and has corrected its request and its exhibits to reflect plaintiffs' payment of non-taxable costs.  *See* Summary, columns headed "Deductions" and "Alamo's Request after Deductions."  Alamo's expenditure of $343,054.66 in attorney's fees and $15,461.78 in costs from June 17, 2008 through the close of litigation does not include those taxable costs already paid by plaintiffs.

19

Second, plaintiffs object that the requested fees and costs attributable to litigation of the issue of attorney's fees should be reduced by 25%. They support this contention with a variety of arguments. First, they argue that the billing arrangement between Benesch and Alamo provides that Benesch not bill Alamo for attorney's fees and costs expended in litigating the issue of attorney's fees. This, plaintiffs contend, encourages "heavy-handed" billing, and they cite the billing of Robert Nupp ("Nupp's") as an example of this

> The primary example of what Plaintiffs consider to constitute overly energetic billing is provided by attorney Robert Nupp's billing slips connected with Alamo's initial Section 285 motion and its reply. As detailed in Auvil Exhibit 5, (a) during the twelve-day period from Friday, March 5, 2010 through Tuesday, March 16, 2010, Mr. Nupp entered time for eleven of those days in connection with Alamo's initial Section 285 motion, with an average exceeding ten hours per day; and (b) during the five days from April 5, 2010 through April 9, 2010, Mr. Nupp billed an average of 13.4 hours per day in connection with Alamo's reply brief.

Response at 7 (footnotes omitted).

The court has little doubt that a client would raise questions about the number of hours billed by Nupp between March 5, 2010 and March 16, 2010 and between April 5, 2010 and April 9, 2010. The court also notes the following, however. The total number of hours billed in connection with the preparation of the motion to declare the case exceptional and award attorney's fees and costs was 149 hours, including drafting a preliminary memorandum on the subject, preparing the exhibits, research, conferences between attorneys about the motion, and drafting and editing the memorandum itself. *See* Exh. 5 at 1-2. Plaintiffs do not argue that the total number of hours was excessive for these tasks. Nupp assumed the primary burden of researching and drafting the memorandum. Moreover, the task had to be completed within 14 days of the entry of consent judgment, a period Wright and Miller acknowledges as "short," given the

20

magnitude of the task. *See* Fed. R. Civ. P. 54(d)(2)(B) and Wright & Miller, 10 Federal Practice and Procedure § 2680. Nupp's greatest number of hours billed fell in the one-week period leading up to the deadline and on the day of the deadline itself. Given the brevity of the deadline and Nupp's primary responsibility for drafting the brief, the court cannot say that the pattern of charges demonstrates "heavy-handed" billing.

Similar circumstances surround the drafting of the reply brief. Alamo had one week to draft a reply, and, again, the burden primarily fell on Nupp to research and draft the document. In its opposition brief, plaintiffs had argued that Alamo's attempt to seek attorney's fees and costs was "unprecedented," given that the case had not been litigated on the merits. They also advanced technical and legal arguments in support of their contention that their litigation position had been reasonable. Finally, plaintiffs also launched an argument that they clearly had waived and was novel to the litigation, infringement under the doctrine of equivalents. The complexity and variety of plaintiffs' arguments made writing the reply brief comparable to writing an opposition brief. Consequently, although the 74 hours devoted to research, conferences between attorneys about the reply, and drafting and editing the document would have been excessive in most cases, plaintiffs' opposition brief justified the increased number of hours spent on the task. Again, plaintiffs do not argue that the total number of hours billed in drafting a reply was excessive. For these reasons, plaintiffs' argument that Benesch's billing was "heavy-handed" with respect to pursuing attorney's fees and costs is unsupported.

Plaintiffs also argue that the activities of Alamo's attorneys between March 2-22, 2011 were primarily a consequence of Alamo's motion for attorney's fees having been

found to be unclear by the court and that the court set a supplemental briefing schedule to clarify some of Alamo's contentions. This greatly overstates the court's request in the matter. The court asked Alamo to tell the court in which documents plaintiffs asserted an interpretation of "disconnected" previously rejected by the court. In essence, the court was asking Alamo for a citation. *See* Minute Order, March 8, 2011, Doc. No. 63. Plaintiffs were given an opportunity to respond to Alamo's filing solely to protect plaintiffs' due process rights. The court did not expect either Alamo's filing or plaintiffs' response to involve any controversy or any significant expenditure of effort.

Finally, plaintiffs argue that Benesch's expenditure of $119,886.91 in fees[13] and costs was unreasonable to recover $226,112.52 in attorney's fees and costs, the amount which plaintiffs believe is owed Alamo. Even assuming that this argument is relevant, plaintiffs' argument is based on two erroneous assumptions.

First, plaintiffs erroneously assume that they could not be held liable for attorney's fees and costs incurred prior to the Federal Circuit's opinion. But a fair reading of the court's September 23 Order could reasonably lead to the conclusion that plaintiffs should have known that their claims were frivolous as early as August 10, 2007, the date on which Alamo provided the schematics for the Tiger mower. *See* September 23 Order at 6-10. From August 10, 2007 through December 21, 2011, Alamo incurred $615,778.35[14] in attorney's fees and costs which might reasonably have been charged to plaintiffs. The expenditure of $126,765.71 to obtain $615,778.35 is

---

[13] The correct figure should be $126,765.71. *See* Summary, column headed "Alamo's Request after Deductions," bottom row.

[14] This includes fees and costs incurred after the filing of the Motion. Consequently, the later-incurred fees and costs do not appear in the Motion.

22

reasonable.

Second, plaintiffs erroneously assume that Alamo seeks to recover $226,112.52 in attorney's fees and costs.  As has already been discussed, the correct figure is $358,516.44 ($343,054.66 in attorney's fees and $15,461.78 in costs).  Again, the expenditure of $126,765.71 to obtain $358,516.44 is reasonable.

One other factor must be considered in assessing the reasonableness of Alamo's expenditures in pursuit of an award of attorney's fees.  Because plaintiffs consented to judgment before the merits of the case had been decided, adjudicating the issue of attorney's fees required Alamo to adjudicate completely the merits of the case.  That is, Alamo had to prove that its mowers did not infringe on the '284 patent *and* it had to prove that the case was exceptional pursuant to § 285.  The issues involved in arguing the merits of the case were complex and required a large number of exhibits.  Given the complexity of the issues argued, the number of exhibits employed in arguing the merits of the case and litigating the issue of attorney's fees, and plaintiffs' untimely assertion of an argument based on the doctrine of equivalents, $126,765.71 in attorney's fees and costs is reasonable.

Defendants support the number of hours billed with invoices, timesheets, evidence that the total billing falls within accepted ranges for this sort of work, and caselaw which would support finding the requested amount to be appropriate in this case.  Plaintiffs' arguments to the contrary are not well taken.  Consequently, Alamo should be awarded $343,054.66 in attorney's fees from the date of the Federal Circuit's opinion through December 21, 2011.

F.      *Summary:  award of attorney's fees and costs*

23

Plaintiffs do not object to the rates charged by Benesch, and those rates are within the applicable norms for representation in patent litigation.  Plaintiffs also do not object to the taxable costs sought by Alamo, and those costs appear to be reasonable and well-supported.  Finally, Alamo supports the number of hours billed with invoices, timesheets, evidence as to the norms for total billings in comparable patent cases up through discovery, and caselaw supporting an award of the amount requested.  Plaintiffs' arguments that the number of hours charged are unreasonable are without merit.

### III.  Conclusion

For the reasons described above, Alamo's motion should be **GRANTED** in part and **DENIED** in part.  Alamo should be awarded $358,516.44 in attorney's fees and costs ($343,054.66 in attorney's fees and $15,461.78 in costs) from June 17, 2009 through December 21, 2011.


Date:  February 6, 2012                        s/ Nancy A. Vecchiarelli
                                                U.S. Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**

24